JUDGE JONES

09 CV 10532

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

EMPLOYEES' RETIREMENT SYSTEM OF :   Civil Action No.
THE GOVERNMENT OF THE VIRGIN : 
ISLANDS, On Behalf of Itself and All Others :   <u>CLASS ACTION</u>
Similarly Situated, :
                              :   COMPLAINT FOR VIOLATION OF NEW
                Plaintiff, :   YORK STATE LAW
                              :
      vs. :
                              :
MORGAN STANLEY & CO. :
INCORPORATED and MORGAN STANLEY :
& CO. INTERNATIONAL LIMITED, :
                              :
              Defendants. :
                              :   <u>DEMAND FOR JURY TRIAL</u>

———————————————————— x



U.S. DISTRICT COURT
FILED
DEC 24 2009
S. D. OF N.Y.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons who acquired "Triple-A" investment grade rated notes due 2045 (the "Rated Notes") issued by an investment fund known as the "Libertas CDO" pursuant to false and misleading credit ratings.

2.      This action charges defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited and their affiliates (together, "Morgan Stanley"), as "arrangers" of the offering, with common law fraud and unjust enrichment.

3.      The Rated Notes were issued as part of a collateralized debt obligation ("CDO"). Generally, CDOs are vehicles that raise investment capital to acquire a portfolio of fixed income securities.  In this case, the securities included approximately 92% residential mortgage-backed securities ("RMBS") and 8% other CDOs.  The RMBS in turn were supported by pools of mortgage loans.

4.      By collaborating with major credit rating agencies to place Triple-A ratings on the Rated Notes, Morgan Stanley intentionally or recklessly misled investors in the Libertas CDO.  But for Morgan Stanley's violations of law, the Rated Notes never would have been issued.

5.      The Libertas CDO contained several unique features.  It did not purchase its constituent securities, such as RMBS, directly.  Rather, the Libertas CDO entered into Credit Default Swaps ("CDS") that referenced specific RMBS.  A CDS is a security, but is similar to insurance involving two parties.  One party selects a specific security such as the RMBS in this case.  That party then "buys" protection from another party, pays a fee for that protection, and is called the "protection buyer."  The fee is typically derived from the credit rating and interest rate paid on the underlying asset.  When certain predetermined credit-related events occur, such as a payment default or a ratings downgrade, the CDS is triggered.  The other party or counterparty to the transaction –– called the "protection seller" –– is then obligated to pay the protection buyer the difference between

the value of the security at the time it was "insured" and the value of the security at the time of the credit event. This type of transaction is typically "settled" in one of two ways: the protection seller may simply make a cash payment, or the seller could take delivery of the underlying instrument and make a payment to the protection buyer. In this way, the protection seller is similar to an insurance company, providing insurance against various risks associated with particular securities.

6.      In a CDS, the credit protection buyer is essentially "shorting" the underlying reference security. Conversely, the credit protection seller is taking a "long" position in that security. The two parties have conflicting positions in a zero-sum situation.

7.      In this case, Morgan Stanley was highly motivated to defraud investors with the Triple-A ratings because it was simultaneously "shorting" nearly the entire $1.2 billion worth of assets included in the Libertas CDO. In other words, Morgan Stanley was betting the entire investment it was promoting would fail. The firm achieved its objective.

8.      Morgan Stanley was neither lucky nor prescient in its strategy. Morgan Stanley had unparalleled access to material non-public information on hundreds of millions of dollars in assets it was betting against and simultaneously selling to investors. Morgan Stanley had in its possession, at the time it sold assets to the Libertas CDO investors, quantitative and qualitative information that other investors did not have. These data demonstrated the fact that the assets backing the Libertas CDO were far riskier than represented and were, indeed, impaired at the time the Libertas CDO was created.

9.      On or about March 21, 2007, Morgan Stanley caused an Offering Memorandum to be issued to investors in connection with and for the purpose of issuing the Rated Notes. According to this document, it was a condition precedent to the issuance of the Rated Notes that they receive Triple-A ratings from the major credit rating agencies Moody's Investors Service, Inc. ("Moody's")

and Standard & Poors ("S&P"), both of which are headquartered in New York City (the "Rating Agencies").

10.     Morgan Stanley collaborated with the Rating Agencies to produce the false credit ratings.

11.     By early 2008, the truth about the quality of mortgages that secured the Rated Notes began to be revealed to the public, exposing the risk of the Rated Notes receiving less absolute cash flow in the future and the likelihood that investors would not receive principal and interest on a timely basis. The Rating Agencies also belatedly began to put negative watch labels on the Rated Notes, ultimately downgrading many. The Rated Notes then collapsed in value. The relatively low interest rates on the Rated Notes never reflected or compensated investors for the risks to which they were exposed. Morgan Stanley knew or recklessly disregarded these facts because it helped the Rating Agencies structure and rate the notes and was responsible for pricing the securities based on those ratings.

## JURISDICTION AND VENUE

12.     The parties are of diverse citizenship and the amount in controversy exceeds $5,000,000 exclusive of interests and costs. The counts alleged herein arise under New York State law, including common law fraud and unjust enrichment. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a) and (d) (diversity).

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a). The violations of law alleged herein occurred in part in this District, including the creation of the false and misleading Triple-A ratings, and the dissemination of these materially false and misleading statements from this District.

## PARTIES

14.     Plaintiff Employees' Retirement System of the Government of the Virgin Islands acquired Rated Notes in March 2007.  Plaintiff invests contributions made by government employees of the Virgin Islands in order to provide retirement benefits to them.

15.     Defendant Morgan Stanley & Co. Incorporated is a Delaware corporation headquartered in New York City, which, together with its affiliate Morgan Stanley & Co. International Limited (collectively, "Morgan Stanley" or "Defendants"), arranged and promoted the Libertas CDO and collaborated with the Rating Agencies to produce the false and misleading Triple-A credit ratings.

## BACKGROUND

16.     The Libertas CDO is a structured finance entity known as a collateralized debt obligation or "CDO."  A CDO is created by investment banks like Morgan Stanley for the purpose of raising large sums of investment capital to buy a pool of other securities.  Such securities are the sole assets of the CDO; thus, the entire value of the CDO ultimately rests on the quality of those assets and the financial structure designed by investment banks and the Rating Agencies to invest in those assets.  For these reasons, representations concerning the quality of the assets underlying the CDO, the processes used to vet and select those asset and the design of the CDO structure, all of which are reflected in the resulting "grades" assigned to the resulting securities, are extremely important to investors.

17.     The CDO at issue in this case is referred to as the Libertas CDO.  Defendants provided assurances to the plaintiff class concerning the security of any investment in this CDO.  All of the Rated Notes sold to investors received Triple-A ratings from the Rating Agencies.  Morgan Stanley helped create these ratings and promoted the Libertas CDO knowing that these ratings were

false and misleading.  Morgan Stanley misrepresented the quality of the Rated Notes in order to induce the Class to enter into extremely risky bets with one of its corporate affiliates.

18.     The Triple-A rating is the highest credit rating that can be given to any fixed income investment.  By way of comparison, securities backed by the full faith and credit of the United States Government, such as U.S. Treasury Notes, are rated Triple-A by both S&P and Moody's.

19.     Because Defendants made affirmative misrepresentations and concealed risks associated with the Libertas CDO, the Rated Notes were not priced appropriately.  Indeed, the Rated Notes were priced at a rate that bore no reasonable relationship to then-prevailing market rates for such low-quality, high-risk assets.

20.     It was a condition to the issuance of the Rated Notes that they receive high credit ratings.  The Offering Memorandum states: "It is a condition to the issuance of the [Rated] Notes on the Closing Date that the [Rated] Notes . . . be rated 'Aaa' by [Moody's] and 'AAA' by [S&P]."

21.     Without the high credit ratings, this condition would have failed and the issuance would not have occurred.

22.     Morgan Stanley knew the credit ratings at issue were false and misleading, among other reasons, because of its extensive collaboration with the Rating Agencies to create billions of dollars in similar structured finance securities.  For example, Morgan Stanley underwrote approximately $21.6 billion in global mortgage-backed securities; another $17.1 billion in U.S. asset-backed securities (which include subprime mortgage securities); and another $5.1 billion in CDOs (including the Libertas CDO) in the first quarter of 2007 *alone.*  Moody's and S&P controlled the overwhelming majority of the ratings and structuring businesses in these markets and worked with Morgan Stanley to structure and rate billions of dollars worth of these structured finance securities.

23.     Since the near collapse of the U.S. capital markets, it has become apparent that issuers such as Morgan Stanley worked with the Rating Agencies to stamp out illusory Triple-A securities based on speculation and knowingly or recklessly false assumptions.   SEC Chairman Cox commented on these assumptions – and the effects of their nondisclosure – as follows:

> In many cases, the complexity of the structured products themselves combined with the lack of quality information about the underlying assets to *make it exceptionally difficult for anyone to determine a credit rating at all*.
>
> Throughout the subprime crisis, there was a marked absence of any clear, prominent explanation of these limitations of the ratings on structured products.  And yet it is now *unmistakable that there were additional risks associated with the credit ratings of those products*.  Investors weren't told, clearly and regularly, *what the assumptions were that underpinned the ratings.  Nor was it clear how structured finance ratings were likely to change based on changes in those assumptions*.

24.     In general, credit ratings are measures of default risk based on the probability of default and the loss severity in the event of default.  The highest credit ratings (AAA from S&P and Aaa from Moody's) indicate a nearly 0% (0.01% in the case of Moody's) chance of default and a low expected loss in the extremely remote chance of default.

25.     Investors reasonably and actually relied on the Triple-A ratings in this case.  The Libertas CDO Offering Memorandum states: "It is *a condition to the issuance* of the [Rated] Notes on the Closing Date that the [Rated] Notes . . . be rated 'Aaa' by [Moody's] and 'AAA' by [ S&P]."

26.     Morgan Stanley at all times knew what the Triple-A credit ratings meant.  Following is Morgan Stanley's description of these meanings:

| Investment Grade | | Moody's | S&P |
|---|---|---|---|
| Highest Grade: Moody's | These bonds are judged to be of the best quality.  They carry the *smallest degree of risk*.  Interest payments are protected by an *exceptionally stable* margin and principal is secure. | Aaa | AAA |

| Investment Grade | | Moody's | S&P |
|---|---|---|---|
| S&P | The issuer's capacity to meet its financial obligation on the bond is ***extremely strong.*** | | |

27.     All of the Rated Notes at issue in this case were sold as Triple-A notes. These ratings were false and misleading for a number of reasons.

## THE TRIPLE-A RATINGS WERE FALSE AND MISLEADING

28.     In the Libertas CDO, as in all CDOs, credit ratings assure investors that the collateral supporting their investment capital was safe, high quality and unimpaired.  However, Morgan Stanley knew that the lenders who originated the underlying mortgages had applied weak (and, importantly, weakening) underwriting standards to originate the loans underlying the Libertas CDO.

29.     As a result, the weak capitalization structure designed by Morgan Stanley with the Rating Agencies' help could not support the Triple-A ratings.

30.     For example, the Libertas CDO included securities tied to mortgage originators Option One and New Century.  These securities are examples of the types of low-quality securities included in the Libertas CDO that contradicted the "exceptionally stable" and "extremely strong" meanings of the Triple-A ratings, as described below.

**Option One Mortgage Corporation**

31.     Option One Mortgage Corporation ("Option One") was one of the largest originators of loans supporting the Libertas CDO.  Investors had exposure to over $130 million of its loans. This figure is more than double the value of the $60 million in subordinated notes credit enhancement that supposedly provided the "equity cushion" necessary to generate the Triple-A ratings. This large exposure to Option One is important because the Rated Notes could only perform as well as the worst assets included in the Libertas CDO.  The reason for this is that the Rated Notes investors were subordinate to Morgan Stanley's $633 million Super Senior Swap, and thus stood

first in line to absorb losses on the worst performing loans before Morgan Stanley suffered any "losses" to its senior security. Thus, the entire offered investment acted as a buffer to Morgan Stanley's retained senior interest.

32.     As to the "losses" Morgan Stanley could suffer after the lower classes were wiped out, these are fictional. If all of the Libertas CDO's underlying assets failed, Morgan Stanley would only "lose" money to itself, because as noted, a corporate affiliate of Morgan Stanley was betting against the entire transaction. Thus, Morgan Stanley stood to reap an enormous financial windfall from the "short" positions it had *vis-à-vis* the Rated Notes. It would essentially take all of the investors' money after the transaction failed.

33.     These powerful economic incentives demonstrate the reason why Morgan Stanley included such low-quality securities, such as those supported by Option One, in the Libertas CDO.

34.     Option One was owned by H&R Block Inc. during the relevant time. In October of 2006, H&R Block Inc. stated it would record a $102 million loss provision due to Option One's increased level of loan repurchases. A loan repurchase occurs when lenders such as Option One are required to buy back loans sold to investors because those loans are in breach of certain representations and warranties, and promises concerning "early payment delinquencies." An early payment delinquency (or "EPD") occurs when a mortgage borrower misses two or more payments in a row within the first six to nine months of the loan. EPDs are leading indicators of weak underwriting standards and origination fraud. Option One stated that more than $102 million in loan repurchases occurred as a result of increases in early payment delinquencies.

35.     When Morgan Stanley marketed and sold the Libertas CDO, it was full of millions of dollars of EPD loans originated by Option One and the other lenders.

36.     The President and Chief Executive Officer of Option One admitted less than two months after Morgan Stanley sold the Rated Notes that loans made by Option One had experienced a serious rise in EPDs.  He made the following statements concerning the deteriorating state of the nonprime mortgage lending industry and the volume of EPDs *before the Libertas CDO was closed*:

- "The industry probably could have avoided most of the things that we're whining about [today]."
- "Everyone in the industry was experiencing early defaults [by the summer of 2006]."

37.     In fact, for Option One's fiscal year ended April 30, 2007, the company was required to repurchase nearly $1 billion in loans that were "put back" to them as a result of EPDs or breaches of representations or warranties made to loan buyers such as Morgan Stanley.  Option One further stated that it continued to experience "high levels of early payment defaults" in 2006.  For the nine months ending January 31, 2007 (just 6 weeks before the Libertas CDO deal closed), Option One had more than a 260% increase in the loan repurchases, which it attributed to higher EPDs.

38.     Option One has represented in its filings with the SEC that: (i) when it is forced to buy back these defective loans, it simply resells them in subsequent transactions, such as the transactions supporting the Libertas CDO, and (ii) Option One's historical experience suggests 90% of such loans will default with nearly 30% loss severity.

39.     Morgan Stanley nonetheless promoted the Libertas CDO as a Triple-A rated investment despite including exposure to Option One loans.  It did so because it was betting against the mortgages underlying the Libertas CDO.

40.     Morgan Stanley knowingly provided a misleading "risk factor" in the Offering Memorandum that stated "[r]ecently, delinquencies, defaults and losses on residential mortgage loans have increased and may continue to increase, which may affect the performance of RMBS

Securities, in particular Residential B/C Mortgage Securities that are backed by subprime mortgage loans."

41.     The "risk" that there was a general, unquantified increase in delinquencies that "may" affect some RMBS somewhere in the greater than $1 trillion RMBS marketplace must be contrasted with the empirical *reality* – then existing and known to Defendants – that the very RMBS selected by Morgan Stanley for inclusion in the Libertas CDO were then affected by a dramatic rise in loan delinquencies.  Morgan Stanley's risk factor is analogous to Captain Smith's telling passengers of the *Titanic* that some ships have "recently sunk" in the Atlantic and therefore "our ship may sink," without mentioning the facts that his ship struck an iceberg, had a hole in it, and was filing with water.

42.     Indeed, at the time Morgan Stanley misrepresented the quality of the Rated Notes, it had in its possession actual numbers demonstrating that the specific loans being sold to investors were impaired, were deteriorating rapidly and performing far worse relative to loans that were previously written according to each originator's own standards.

43.     For example, Option One had experienced total delinquent loans of 6.03% in 2003; 4.91% in 2004; 5.10% in 2005; and 4.11% as of the period ending June 30, 2006.  By contrast, the Libertas CDO included Option One loan pools that had more than double these averages *before* they were included in the Libertas CDO.  Because delinquencies are strong indicators of the quality of loans comprising the pool, Defendants' misleading "risk factor" and omission of actual statistical information is indicative of their intent to unload enormous credit risk onto plaintiff for their own financial gain.  Again, because Morgan Stanley was "shorting" the entire transaction, it stood to reap large financial rewards when the deal fell apart.

44.     The fact that Option One was making loans based on weakening underwriting criteria further contradicts the Triple-A ratings.  The Massachusetts Attorney General filed a complaint, dated June 3, 2008, against Option One that states Option One made loans *without considering the borrower's ability to pay,* and starting in 2004 "began to abandon traditional underwriting standards and instead originate loans featuring multiple layers of risk without regard to whether their borrowers could afford the loan."  The complaint also states:

- "Because [Option One and its affiliates'] intention was to sell or securitize residential subprime loans to the secondary market in the short term, however, they knowingly and willfully failed to consider borrowers' ability to repay the loans over the long term."

- Option One and its affiliates' "*indifference to a borrower's ability to pay is reflected in their unfair and exceedingly risky loan products*, their relaxed and unfair underwriting practices, and their deceptive loan sales practices through their own conduct and the conduct of mortgage brokers and loan officers."

45.     Because the Rated Notes' economic viability depended in large measure on the performance of loans originated by this single entity, and because those loans were very risky, sourced under weak and weakening lending standards and had shown clear statistical signs of deterioration before the Rated Notes were issued, it is clear the Triple-A ratings were false and misleading.

**New Century Mortgage Corporation**

46.     The Libertas CDO also included exposure to over $100 million in mortgage loans originated by New Century Mortgage Corporation ("New Century").  Approximately 11.42% of the Libertas CDO's assets were backed by New Century loans.

47.     In the Offering Memorandum, Morgan Stanley described New Century:

On March 13, 2007, NCFC [New Century] issued a press release announcing that its common stock, Series A Cumulative Redeemable Preferred Stock and Series B Cumulative Redeemable Preferred Stock were no longer suitable for trading on the New York Stock Exchange ("NYSE") and would be suspended from trading on the

NYSE. *Published reports regarding NCFC indicated that NCFC is the subject of a federal criminal inquiry under federal securities laws in connection with <u>trading</u> in the company's securities as well as <u>accounting errors</u> about its allowance for repurchase losses.* Several published reports also speculated that NCFC would seek bankruptcy protection or be liquidated.  These events are likely to affect the performance of the Collateral Assets (or Reference Obligations) serviced or originated by NCFC, which may affect the ability of the Issuer to make payments with respect to the Rated Notes and the Subordinated Notes.

48.     The foregoing "risk factor" demonstrates Morgan Stanley knew it was including a material amount of New Century loans in the Libertas CDO.

49.     Morgan Stanley did not "correct" the Triple-A ratings based on this information, however, nor did Morgan Stanley asterisk these ratings and explain that New Century was drowning in EPDs throughout 2005 and 2006, and that it was forced to buy back an increasing volume of its loans *because those loans were in breach of the representations and warranties New Century made to buyers in securitization transactions.*  The risk factor Morgan Stanley included focused on New Century's "accounting" as opposed to systemic, quantifiable violations of promises going to the *quality* of loans Morgan Stanley was selling to investors through the Libertas CDO. New Century's "accounting" would not affect the Libertas CDO, but the low quality of its *products* contradicted the Triple-A ratings.

50.     The quality of New Century's loans started to deteriorate substantially – relative to its *own* historical "subprime" lending patterns and origination standards – in 2005, throughout 2006 and into 2007.  All or substantially all of the greater than $100 million in New Century loans underlying the Libertas CDO were originated during this time period.

51.     New Century declared bankruptcy on April 2, 2007.  Morgan Stanley knew that New Century was about to go bankrupt because it participated in a March 6, 2007 conference call with New Century senior management shortly before the company collapsed.  This information was

reported by *The Wall Street Journal* on March 29, 2007, a week after Morgan Stanley closed

Libertas CDO transaction:

> In February, New Century mortgages that had been worth $8 billion fell by more than $300 million within days, someone familiar with the matter says.

*    *    *

> New Century was running out of options. It was unable to get new financing and in violation of its existing lending agreements, in part because it was low on cash. So the company convened the ***March 6 conference call with its 11 lenders.***

*    *    *

> The bankers listened without indicating whether they'd help. In private meetings after hanging up, some expressed shock at New Century's precarious state, given its depleted cash supply. "That told us the situation was more dire than we thought," says a banker on the call.

> ***That night, Citigroup moved forward with a decision to declare New Century in default. Others followed. The next day, Mr. Einhorn resigned from New Century's board. Though Morgan Stanley agreed to a $265 million loan, it demanded as collateral a loan portfolio worth even more, and reversed course a few days later and cut off additional financing.***

52.     Morgan Stanley was New Century's fourth largest creditor. It seized nearly

$2.5 billion in loans and conducted a fire sale of those loans on March 26, 2007, less than a week

after it pitched over $100 million in New Century loans to and at the Libertas CDO investors.

53.     In the Offering Memorandum, Morgan Stanley stated that "[s]everal published

reports also speculated that [New Century] would seek bankruptcy protection or be liquidated."

Setting aside Morgan Stanley's direct knowledge about the accuracy of this reported "speculation,"

it never disclosed the concrete information it did have concerning the quality of loans originated by

New Century, nor did it step in to correct the Triple-A ratings to reflect this information. That

information was revealed publicly after New Century declared bankruptcy.

54.     The U.S. Bankruptcy Court of the District of Delaware presiding over the New

Century case appointed an examiner (the "Examiner") to work with governmental agencies to

investigate New Century's accounting practices, among other things. The Examiner engaged a law firm, forensic accountants and financial advisors to assist in his investigation and reporting. The Examiner provided a final report to the Bankruptcy Court dated February 29, 2008 (the "New Century Bankruptcy Report").

55.     The New Century Bankruptcy Report concludes that the "increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007." The Examiner made numerous findings that are directly applicable to the loans included by Defendants in the Libertas CDO. All or substantially all of such loans were originated by New Century during the 2005 to early 2007 time period. These facts were known to Defendants because they were active participants in the "whole loan market" and therefore had direct access to New Century management and direct knowledge of the enormous volume of the investor "kickouts" and "early payment defaults" discussed below.

56.     "Kickouts" and "early payment defaults" are important loan quality metrics. Kickouts occur in the context of bulk or "whole loan" sales by New Century to bulk buyers of its loans, such as Morgan Stanley, who, in turn, sell those loans to investors via securitization transactions like the RMBS included in the Libertas CDO. New Century sold the vast majority of the loans it originated. It sold nearly all of those loans (except for four direct securitizations in 2005) in whole loan transactions. Before acquiring loans in such bulk sales transactions, buyers are afforded the opportunity to conduct due diligence on the subject loan pool. At that time, investors can refuse to acquire certain loans from that particular pool. Those rejected loans are so-called "kickouts." Bulk buyers explain to originators the reasons why such loans are being rejected, such as deviation from the originator's stated underwriting standards, defective home appraisals, or missing documentation.

57.     The Examiner made the following finding with respect to the reasons why New Century's loans were often rejected in kickouts:

> As noted, investors primarily kicked out loans due to defects in the loan origination processes, such as defective appraisals, unacceptable exceptions made to underwriting guidelines and missing documentation, each of which was an indication of the quality of the loans that were originated, since most loans rejected by purchasers reflected deviations by New Century from its loan origination processes.

58.     New Century experienced serious deterioration in loan quality from 2005 through early 2007.  Defendants were aware of these facts.  These facts contradict the Triple-A ratings.

59.     For example, with respect to New Century loans originated in 2005, the Examiner found that EPDs increased steadily from 6.58% in April 2005 to 9.24% in December of 2005. Similarly, "kickouts" from whole loan sales steadily increased from 5.64% in January of 2005 to 8.77% in December of 2005, which amounted to nearly $2.3 *billion* dollars in loans.  Importantly, among the top reasons given for kicking out loans were property value, documentation, compliance and excessive debt-to-income issues.  Approximately $280 million of loans were kicked out "due to loan files that were missing required documentation – loans that never should have been funding until the files were complete."  As discussed below, Morgan Stanley was a New Century whole-loan buyer and therefore had first-hand knowledge of its deteriorating loan quality.

60.     From an already deteriorated loan quality condition in 2005, the Examiner made the following findings concerning New Century's loans in 2006 and 2007:

> ***New Century's loan quality trends worsened dramatically in 2006 and early 2007.*** The most important metrics by which New Century tracked loan quality, EPD and kickouts, showed large increases throughout the year.  Further, in March and September 2006, it became clear that loans originated by New Century in 2005 and early-2006 had ***significantly greater delinquency rates*** than similar loans originated by New Century in 2003 and 2004 . . . .

61.     The Examiner found that the same problems causing loan quality to deteriorate in 2005, such as defective property appraisals and missing documentation, continued throughout 2006.

EPDs continued to increase, rising from 8.37% in January of 2006 to 16.82% in December of 2006. Kickout percentages increased from 6.92% in January of 2006 to 14.95% in December of 2006: "The same sorts of problems were identified as the chief causes of the kickouts, again indicating that loan quality was inadequate and that the recurring problems in the loan origination processes had not yet been fixed." In 2006, there were a total of over $5.2 **billion** in kickouts (almost double 2005's already alarming $2.3 billion amount) and $693 million in loans were kicked out due to the risk of missing documentation (more than double 2005's $280 million worth of missing documents).

62.     Consistent with the Examiner's findings, New Century loans included in the Libertas CDO had atrocious performance characteristics *at the time they were included in the Libertas CDO*. The Libertas CDO included loan pools with alarming delinquency statistics by any measure. As a point of comparison, for all of New Century's 2005 loans, the company reported 2.42% fell within its "60+" (or nearly three months late in payment) loan delinquency category as of the end of 2005. In contrast, New Century loans included in the Libertas CDO had delinquency statistics that were more than ten times higher.

63.     Morgan Stanley also had direct, inside knowledge of the kickout, EPD and credit quality deterioration characterizing New Century's loans during the relevant time. Morgan Stanley had a long-standing relationship with New Century and regularly purchased large pools of mortgages from New Century in whole-loan transactions and provided large loans or "warehouse" financing to New Century. In 2005 alone, Morgan Stanley bought $5.8 billion in loans originated by New Century. In 2004, Morgan Stanley bought $14.1 billion of New Century's loans. In addition to Morgan Stanley's whole-loan acquisitions, it underwrote over $10 billion in New Century securities from 1998 through 2006. Further, Morgan Stanley provided billions of dollars in "warehouse"

financing to New Century.  Those loans were backed by New Century's mortgages.  Morgan Stanley conducted a fire sale of $2.5 billion of such mortgages a week after it closed the Libertas CDO.

64.     Morgan Stanley failed to disclose the fact that its due diligence processes (or lack thereof) on these loans undermined the ratings assigned by the Rating Agencies.  S&P, for example, has publicly stated that "issuers and arrangers [such as Morgan Stanley] of mortgage-backed securities bundle those loans *and perform due diligence"* and in order *"[f]or the system to function properly, S&P relies, as it must, on these participants to fulfill their roles and obligations to verify and validate information before they pass it on to others, including S&P."*  Without the Triple-A rating of S&P, the Rated Notes would not have been issued per the Offering Memorandum.  Indeed, without high credit ratings, the securities supporting the Libertas CDO would not have even been *eligible* for issuance on a "shelf takedown" basis under the SEC rules.  The reason the SEC permits securities such as those backing the Libertas CDO to be issued on Form S-3 – which involves far less oversight by the SEC than in a typical registration – is because of the very low risk such securities represent to the investment community as a result of the high-quality, low-risk nature of securities that receive such ratings.

65.     Given Morgan Stanley's relationship with New Century and other lenders, clearly it reviewed non-public information concerning the deteriorating credit quality of loans originated by New Century and other lenders underlying the Libertas CDO.

66.     Morgan Stanley failed to correct the Triple-A ratings in light of this information.  It was no accident that it failed to do so, as Morgan Stanley was betting *against* the very mortgages it was marketing to investors.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS
## UNDERLYING THE RATED NOTES

67.     Starting in late 2007, disclosures concerning the credit quality of the assets underlying the Rated Notes began to emerge. Substantial negative action was taken by various rating agencies with respect to these underlying assets. Further, the Rating Agencies have downgraded or taken negative action on all of the Rated Notes. Many of the downgrades caused the Rated Notes and underlying RMBS to drop from "investment grade" to "junk" status in a single rating decision.

68.     By June 2008, the Rated Notes had been corrected from Triple-A to very low "junk" ratings.

69.     The ratings action represents only a partial picture of the rapid deterioration of the collateral underlying the Rated Notes. Millions of dollars worth of mortgages sold by Morgan Stanley to investors via the Rated Notes have missed mortgage payments for 90 or more days, far in excess of what investors would anticipate from Triple-A securities.

70.     Further, recent revelations show, among other things, that Morgan Stanley influenced the ratings assigned by the Rating Agencies. The ratings were not unbiased, independent or objective. The SEC has recently confirmed these facts.

71.     Chairman Cox made the following statements on June 11, 2008 in connection with the SEC's investigation into the Rating Agencies:

> Throughout the subprime crisis, there was a marked absence of any clear, prominent explanation of these limitations of the ratings on structured products. And yet *it is now unmistakable that there were <u>additional</u> risks associated with the credit ratings of those products.* Investors weren't told, clearly and regularly, what the assumptions were that underpinned the ratings. Nor was it clear how structured finance ratings were likely to change based on changes in those assumptions.

*       *       *

> As if all of this weren't enough, the limited historical data available as a basis for judging the credit risk of subprime lending activities significantly increased the model risk and the rating process. The *historical data on subprime loans were*

*based on periods of rising home prices*. As a result, the broad market downturn that actually occurred wasn't anticipated by the models.

72.     In reality, the Rated Notes never were Triple-A securities, as Morgan Stanley knew. A partial explanation for the disparity between the "smallest degree of risk" and "extremely strong" meanings of the Triple-A labels and the actual risks included in the Libertas CDO hinges on the Rating Agencies' conflicts of interests with investors.   On information and belief – including Morgan Stanley's collaboration with the Rating Agencies in creating and marketing the structured finance securities discussed herein – Morgan Stanley was well aware that the ratings process itself was corrupted.

73.     SEC Chairman Cox further explained that issuers like Morgan Stanley rewarded the Rating Agencies for telling them how to get the credit ratings they knew were necessary to market products like the Libertas CDO:

> [We] have learned since then that the ratings of structured products in the subprime area made those conflicts of interest even more acute.  That's because structured products were specifically designed for each tranche to achieve a particular *credit rating – and the ratings agencies then made a lucrative business of consulting with issuers on exactly how to go about getting those ratings.  Selling consulting services to entities that purchased ratings became a triple-A conflict of interest*.

74.     Following the revelations concerning the quality of assets included in the Libertas CDO and the flawed processes used by Morgan Stanley in collaboration with the Rating Agencies to create the Triple-A ratings, the Rated Notes collapsed in value.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of a class consisting of all persons or entities who acquired the Rated Notes.  Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are numerous members in the proposed Class.  This belief is based on the face that over $250 million in Rated Notes were issued by the Libertas CDO.  Members of the Class may be identified from records maintained by Morgan Stanley or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of New York law as alleged herein.

78.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

79.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants intentionally or recklessly omitted and/or misrepresented material facts about the Rated Notes; whether Defendants have been unjustly enriched; and to what extent the members of the Class have sustained damages and the proper measure of damages.

80.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Common Law Fraud

81.     Plaintiff repeats and realleges each and every allegation contained above.

82.     Plaintiff brings this claim against Defendants.

83.     To induce plaintiff and other Class members to purchase the Rated Notes, Defendants made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including misrepresentations and omissions regarding the safety and credit risk underlying the Rated Notes.

84.     At the time the misrepresentations and misleading statements were made to plaintiff and other Class members Defendants knew these statements were false or misleading, or acted with a reckless disregard of their truth and completeness.

85.     In reasonable reliance upon the false and misleading statements alleged herein, plaintiff and other Class members were induced to and did purchase or otherwise acquire interests in the Rated Notes.

86.     As a direct and proximate result of Defendants' fraud, plaintiff and the other Class members suffered damages, including purchasing the Rated Notes at a grossly inflated price, in a total amount to be determined at trial.

## COUNT II

### Unjust Enrichment

87.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

88.     Plaintiff brings this claim against Defendants.

89.     The Defendants supplied information for the guidance of the plaintiff and other members of the Class in deciding whether to invest in the Rated Notes.  Such information included representations and omissions regarding the structure of the Libertas CDO and the safety of the collateral as reflected in the Triple-A ratings.  These representations were false.

90.     Class members' purchases of the Rated Notes benefited Morgan Stanley in that it received millions of dollars in fees and hundreds of millions of dollars in windfall profits when the Libertas CDO collapsed.

91.     Morgan Stanley knew it was receiving this benefit, and it is inequitable for Morgan Stanley to retain this benefit from Class members.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as Class representative;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against Defendants, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding punitive damages for Defendants' intentional, willful and malicious misconduct; and

E.     Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  December 24, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JASON C. DAVIS
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

- 23 -

**09 CV 10532**

JS 44C/SDNY
REV. 1/2008

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

DEC 24 2009

| PLAINTIFFS | DEFENDANTS |
|---|---|
| EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE VIRGIN ISLANDS, On Behalf of Itself and All Others Similarly Situated, | MORGAN STANLEY & CO. INCORPORATED and MORGAN STANLEY & CO. INTERNATIONAL LIMITED, |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Coughlin Stoia Geller Rudman & Robbins, 58 So. Service Road, Suite 200, Melville, NY 11747 (631) 367-7100 | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a) and (d) (diversity).

Has this or a similar case been previously filed in SDNY at any time? No? [✓] Yes? [ ]   Judge Previously Assigned _____

If yes, was this case Vol.[ ] Invol. [ ] Dismissed. No[ ] Yes [ ] If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*                    NATURE OF SUIT

**TORTS**                                    **ACTIONS UNDER STATUTES**

**CONTRACT**

| | | **PERSONAL INJURY** | **PERSONAL INJURY** | **FORFEITURE/PENALTY** | **BANKRUPTCY** | **OTHER STATUTES** |
|---|---|---|---|---|---|---|
| [ ] 110 | INSURANCE | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 610 AGRICULTURE | [ ] 422 APPEAL 28 USC 158 | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 120 | MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 620 OTHER FOOD & DRUG | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 410 ANTITRUST |
| [ ] 130 | MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | | [ ] 430 BANKS & BANKING |
| [ ] 140 | NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | | | **PROPERTY RIGHTS** | [ ] 450 COMMERCE |
| [ ] 150 | RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | **PERSONAL PROPERTY** | [ ] 630 LIQUOR LAWS | | [ ] 460 DEPORTATION |
| | | [ ] 345 MARINE PRODUCT LIABILITY | [X] 370 OTHER FRAUD | [ ] 640 RR & TRUCK | [ ] 820 COPYRIGHTS | [ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 151 | MEDICARE ACT | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | [ ] 650 AIRLINE REGS | [ ] 830 PATENT | |
| [ ] 152 | RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | [ ] 660 OCCUPATIONAL SAFETY/HEALTH | [ ] 840 TRADEMARK | [ ] 480 CONSUMER CREDIT |
| [ ] 153 | RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | [ ] 690 OTHER | **SOCIAL SECURITY** | [ ] 490 CABLE/SATELLITE TV |
| | | | | | [ ] 861 HIA (1395ff) | [ ] 810 SELECTIVE SERVICE |
| | | | | **LABOR** | [ ] 862 BLACK LUNG (923) | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 160 | STOCKHOLDERS SUITS | | | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 875 CUSTOMER CHALLENGE 12 USC 3410 |
| [ ] 190 | OTHER CONTRACT | | | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 864 SSID TITLE XVI | |
| [ ] 195 | CONTRACT PRODUCT LIABILITY | | | [ ] 720 LABOR/MGMT RELATIONS | [ ] 865 RSI (405(g)) | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 196 | FRANCHISE | | | [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT | | [ ] 891 AGRICULTURAL ACTS |
| | | **ACTIONS UNDER STATUTES** | | [ ] 740 RAILWAY LABOR ACT | **FEDERAL TAX SUITS** | [ ] 892 ECONOMIC STABILIZATION ACT |
| | | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 OTHER LABOR LITIGATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 893 ENVIRONMENTAL MATTERS |
| | | [ ] 441 VOTING | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 791 EMPL RET INC SECURITY ACT | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 894 ENERGY ALLOCATION ACT |
| | | [ ] 442 EMPLOYMENT | | | | [ ] 895 FREEDOM OF INFORMATION ACT |
| **REAL PROPERTY** | | [ ] 443 HOUSING ACCOMMODATIONS | [ ] 530 HABEAS CORPUS | **IMMIGRATION** | | [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE |
| [ ] 210 | LAND CONDEMNATION | [ ] 444 WELFARE | [ ] 535 DEATH PENALTY | | | |
| [ ] 220 | FORECLOSURE | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 540 MANDAMUS & OTHER | [ ] 462 NATURALIZATION APPLICATION | | |
| [ ] 230 | RENT LEASE & EJECTMENT | | [ ] 550 CIVIL RIGHTS | [ ] 463 HABEAS CORPUS- ALIEN DETAINEE | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 240 | TORTS TO LAND | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION ACTIONS | | |
| [ ] 245 | TORT PRODUCT LIABILITY | [ ] 440 OTHER CIVIL RIGHTS | | | | |
| [ ] 290 | ALL OTHER REAL PROPERTY | | | | | |

890156

Check if demanded in complaint:

[X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

DEMAND $ _____ OTHER _____   JUDGE _____   DOCKET NUMBER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [✓] YES [ ] NO      NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

(PLACE AN x IN ONE BOX ONLY) ORIGIN

☑ 1 Original Proceeding   ☐ 2a. Removed from State Court   ☐ ...ded from Appellate Court   ☐ ...einstated or ...opened   ☐ 5 Transferred from (Specify District)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge Judgment

☐ 2b. Removed fr... State Cou... at least ... party is

(PLACE AN x IN ONE BOX ONLY)   B... OF JURISDICTION   IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1322, 1441)

☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEF...ANT   ☐ 3 ...AL QUESTION (... NOT A PARTY)   ☑ 4 DIVERSITY

CITIZENS... ... PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [x] 2 | [x] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

3438 Kronprindsens Gade
GERS Complex, 3rd Floor
St. Thomas, Virgin Islands  00802-5712

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Morgan Stanley & Co. International Limited
25 Cabot Square, Canary Wharf
London E14 4QA England

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, NY 10036
(New York City)

Morgan Stanley & Co., International Limited
25 Cabot Square
Canary Wharf
London, E14 4QA
United Kingdom

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   ☐ WHITE PLAINS   ☑ MANHATTAN
(DO NOT check either box if this a PRISONER PETITION.)

DATE 12/24/09   SIGNATURE OF ATTORNEY OF RECORD

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[X] YES (DATE ADMITTED Mo. 05  Yr. 1995 )
Attorney Bar Code # SR7957

Magistrate Judge is to be designated by the Clerk of the Court.   MAG. JUDGE KATZ

Magistrate Judge _____ is so Designated.

J. Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)