**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------x
:
EMPLOYEES' RETIREMENT SYSTEM OF THE      :
GOVERNMENT OF THE VIRGIN ISLANDS,        :
on behalf of itself and all others       :
similarly situated,                      :
:
                          Plaintiff,     :
:09 Civ. 10532(BSJ)(THK)
                 v.                      :
: **Memorandum and Order**
MORGAN STANLEY & CO. INCORPORATED and    :
MORGAN STANLEY & CO. INTERNATIONAL       :
LIMITED,                                 :
:
                          Defendants.    :
:
----------------------------------------x
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

　　　Plaintiff Employees' Retirement System of the Government of

the Virgin Islands, on behalf of itself and all others similarly

situated, filed a two-count class action complaint for common

law fraud and unjust enrichment against Defendants Morgan

Stanley & Co. Inc. and Morgan Stanley & Co. International Ltd.

(collectively, "Morgan Stanley").  (Dkt. 1.)  Morgan Stanley

moves to dismiss pursuant to Federal Rules of Civil Procedure

8(a), 9(b), and 12(b)(6).  (Dkt. 11.)  For the reasons provided

below, Morgan Stanley's motion to dismiss is GRANTED.

## BACKGROUND

### i.  Overview

Plaintiff, an institutional investor, acquired Triple-A rated notes, issued by an investment fund known as the "Libertas CDO," in March 2007.  (Compl. ¶¶ 1, 14, 17[1].)  The notes were issued as part of a collateralized debt obligation ("CDO"). (Id. ¶ 3.)  Rather than purchasing its constituent securities directly, the Libertas CDO entered into credit default swaps ("CDS") that referenced specific residential mortgage-backed securities ("RMBS").  (Id. ¶ 5.)

As a general matter, CDOs are created by investment banks, such as Morgan Stanley, for the purpose of raising large sums of investment capital to buy a pool of other securities.  (Id. ¶ 16.)  The value of a CDO hinges on the quality of its underlying assets and the financial structure for investing in those assets.  (Id.)  As a result, representations regarding the quality of the assets underlying a CDO, the process to vet and select its assets, and the design of its structure, all of which are reflected in the resulting "grades" assigned to the securities by credit rating agencies, are extremely important to investors.  (Id.)  The highest rating for a fixed income investment is Triple-A.  (Id. ¶ 18.)  Triple-A ratings indicate

---

[1] All facts in this section are drawn from the Complaint and are presumed true for purposes of this motion.  See King Cnty., Washington v. IKB Deutsche Industriebank AG, 751 F. Supp. 2d 652, 655 n.2 (S.D.N.Y. 2010).

a nearly 0% chance of default and a low expected loss in the
remote chance of a default.  (Id. ¶ 24.)

Plaintiff alleges Morgan Stanley[2] arranged and promoted the
Libertas CDO and collaborated with Moody's Investors Service,
Inc. ("Moody's") and Standard & Poors ("S&P") to produce false
and misleading Triple-A credit ratings.  (Id. ¶ 15.)  Morgan
Stanley was motivated to defraud investors with false and
misleading Triple-A ratings because it was taking a short
position on nearly all of the assets included in the Libertas
CDO.  (Id. ¶ 7.)  Morgan Stanley lured investors——in an Offering
Memorandum it caused to be issued to potential investors on or
about March 21, 2007——by making it a condition precedent to the
issuance of the notes that they receive Triple-A ratings from
Moody's and S&P.  (Id. ¶ 9.)

At the same time Morgan Stanley was betting against the
Libertas CDO and selling it to investors, it had material non-
public information that other investors did not have.  (Id.
¶ 8.)  The information showed that the assets backing the
Libertas CDO were far riskier than presented and were impaired
when the Libertas CDO was created.  (Id.)  Due to Morgan
Stanley's affirmative misrepresentations and concealment of the
risks associated with the Libertas CDO, the notes were not
priced appropriately.  (Id. ¶ 19.)

---

[2] According to the Complaint, Morgan Stanley & Co. Inc. is a Delaware
corporation headquartered in New York City.  (Compl. ¶ 15.)

Morgan Stanley perpetrated this fraud by virtue of, among other things, its extensive collaboration with Moody's and S&P to create billions of dollars in similar structured finance securities. (Id. ¶ 22.) In addition to its familiarity with the rating agencies, Morgan Stanley knew that the lenders who originated the underlying mortgages applied weak (and weakening) underwriting standards to originate the loans underlying the Libertas CDO. (Id. ¶ 28.) The Complaint discusses, at length, two of the largest mortgage originators with loans underlying the Libertas CDO—Option One Mortgage Corporation ("Option One") and New Century Mortgage Corporation ("New Century"). (See id. ¶¶ 31-66.)

### ii. Option One and New Century

First, with respect to Option One, Plaintiff claims when Morgan Stanley marketed and sold the Libertas CDO, the CDO was loaded with millions of dollars of early payment delinquency ("EPD") loans originated by Option One. (Id. ¶ 35.) An EPD occurs when a mortgage borrower misses two or more payments in a row within the first six to nine months of the loan. (Id. ¶ 34.) EPDs are leading indicators of weak underwriting standards and origination fraud. (Id.) For Option One's fiscal year ended April 30, 2007, the company was required to repurchase nearly $1 billion in loans as a result of EPDs or breaches of representations or warranties made to loan buyers

4

(such as Morgan Stanley).  (Id. ¶ 37.)  For the nine months
ending January 6, 2007 (6 weeks before the Libertas CDO closed),
Option One had more than a 260% increase in the loan repurchases
it attributed to higher EPDs.  (Id.)

    In addition, at the same time Morgan Stanley was
misrepresenting the quality of the notes, it had in its
possession figures indicating that the specific loans it
selected for the Libertas CDO were impaired, deteriorating
rapidly, and performing far worse relative to previously written
loans.  (Id. ¶¶ 41–42.)  For example, while Option One
experienced total delinquent loans of 6.03% in 2003, 4.91% in
2004, 5.10% in 2005, and 4.11% as of the period ending June 30,
2006, the loan pools in the Libertas CDO had more than double
these averages before they were included in the CDO.  (Id.
¶ 43.)  Despite these clear signs of deterioration before the
notes were issued, Morgan Stanley touted the Triple-A ratings,
which it allegedly knew were false and misleading, because it
was shorting the entire transaction and stood to benefit when it
failed.  (Id. ¶¶ 43, 45.)

    Second, with respect to New Century, Plaintiff asserts the
Libertas CDO included exposure to over $100 million in mortgage
loans originated by New Century.  (Id. ¶ 46.)  Approximately
11.42% of the Libertas CDO's assets were backed by New Century
loans.  (Id.)  In support of its argument regarding the

5

deteriorating quality of New Century's loans, Plaintiff relies
heavily on a report prepared by an examiner appointed by the
United States Bankruptcy Court for the District of Delaware in
New Century's bankruptcy case before that court ("Bankruptcy
Report").  (Id. ¶¶ 54-62.)  Plaintiff quotes, for example, the
following section from the Bankruptcy Report:

> New Century's loan quality trends worsened
> dramatically in 2006 and early 2007.  The most
> important metrics by which New Century tracked loan
> quality, EPD and kickouts, showed large increases
> throughout the year.  Further, in March and September
> 2006, it became clear that loans originated by New
> Century in 2005 and early-2006 had significantly
> greater delinquency rates than similar loans
> originated by New Century in 2003 and 2004.

(Id. ¶ 60.)

　　　Kickouts occur in the context of bulk or whole loan sales
by mortgage originators, such as New Century, to bulk loan
buyers, such as Morgan Stanley, who, in turn, sell those loans
to investors via securitization transactions.  (Id. ¶ 56.)
Before acquiring loans in bulk sale transactions, buyers may
conduct due diligence on the subject loan pool.  (Id.)
Investors can refuse to acquire certain loans from that
particular pool.  (Id.)  Rejected loans are referred to as
kickouts.  (Id.)  Bulk buyers reject such loans for a variety of
reasons, including because they deviate from the originator's
stated underwriting standards, defective home appraisals, or
missing documentation.  (Id.)

6

In the Bankruptcy Report, the examiner stated the following regarding rejected New Century loans:

> [I]nvestors primarily kicked out loans due to defects in the loan origination processes, such as defective appraisals, unacceptable exceptions made to underwriting guidelines and missing documentation, each of which was an indication of the quality of the loans that were originated, since most loans rejected by purchasers reflected deviations by New Century from its loan origination process.

(<u>Id.</u> ¶ 57.)  In 2006, New Century experienced over $5.2 billion in kickouts——approximately double the amount for 2005 ($2.3 billion).  (<u>Id.</u> ¶ 61.)  Of that amount, $693 million worth of loans were kicked out due to the risk of missing documentation—— more than double the amount for 2005 for missing documents ($280 million).  (<u>Id.</u>)  With respect to EPDs, from January 2006 to December 2006, EPDs on New Century loans rose from 8.37% to 16.82%.  (<u>Id.</u>)  Moreover, while New Century reported that 2.42% of its total loans fell within its "60+" (or nearly three months late in payment) loan delinquency category for 2005, the New Century loans included in the Libertas CDO had delinquency rates that were over ten times that high.  (<u>Id.</u> ¶ 62.)  Based on these and other statistics, Plaintiff concludes that the New Century loans included in the Libertas CDO had atrocious performance characteristics at the time they were included in the Libertas CDO.  (<u>Id.</u>)

As New Century's fourth largest creditor, who purchased
billions of dollars worth of loans originated by New Century in
2004 and 2005, Plaintiff alleges Morgan Stanley had direct,
inside, non-public information regarding the deteriorating
quality of New Century's loans during the relevant period.  (Id.
¶¶ 52, 63, 65.)  In addition to purchasing loans originated by
New Century, Morgan Stanley underwrote over $10 billion in New
Century securities from 1998 to 2006.  (Id. ¶ 63.)  Morgan
Stanley also provided billions of dollars in warehouse financing
to New Century—loans backed by New Century mortgages.  (Id.)

On March 6, 2007, less than a month before New Century
filed for bankruptcy (April 2, 2007), Morgan Stanley
participated in a conference call with New Century's senior
management.  (Id. ¶ 51.)  During the call, according to a Wall
Street Journal article quoted by Plaintiff, New Century informed
its "11 lenders" that New Century's situation "'was more dire
than'" thought.  (Id.)  "Though Morgan Stanley agreed to a $265
million loan, it demanded as collateral a loan portfolio worth
even more, and reversed course a few days later and cut off
additional financing."  (Id.)

Despite reviewing non-public information concerning the
deteriorating credit quality of loans originated by New Century
and other lenders underlying the Libertas CDO, Morgan Stanley
failed to disclose that its due diligence process (or lack

8

thereof) undermined the Triple-A ratings assigned by Moody's and
S&P.  (Id. ¶¶ 64-65.)  Morgan Stanley failed to correct these
ratings, according to Plaintiff, because it was betting against
the Libertas CDO.  (Id. ¶ 66.)  Plaintiff contends Morgan
Stanley was ultimately for pricing the Libertas CDO based on the
false Triple-A ratings.  (Id. ¶ 11.)

**iii.   Risk Disclosures**

Plaintiff concedes Morgan Stanley included a "risk factor"
in the Offering Memorandum it circulated to potential investors
on March 21, 2007.  (Id. ¶¶ 9, 40.)  It stated, among other
things, "[r]ecently, delinquencies, defaults and losses on
residential mortgage loans have increased and may continue to
increase, which may affect the performance of RMBS Securities,
in particular Residential B/C Mortgage Securities that are
backed by subprime mortgage loans."  (Id. ¶ 40)  This general
description of "risk," according to Plaintiff, contrasts sharply
"with the empirical reality . . . known to" Morgan Stanley "that
the very RMBS selected . . . for inclusion in the Libertas CDO
were then affected by a dramatic rise in loan delinquencies."
(Id. ¶ 41.)

With respect to New Century, the Offering Memorandum was
more specific:

> On March 13, 2007, NCFC [New Century] issued a press
> release announcing that its common stock, Series A
> Cumulative Redeemable Preferred Stock and Series B

> Cumulative Redeemable Preferred Stock were no longer
> suitable for trading on the New York Stock Exchange
> ("NYSE") and would be suspended from trading on the
> NYSE.  Published reports regarding NCFC indicated that
> NCFC is the subject of a federal criminal inquiry
> under federal securities laws in connection with
> trading in the company's securities as well as
> accounting errors about its allowance for repurchase
> loans.  Several published reports also speculated that
> NCFC would seek bankruptcy protection or be
> liquidated.  These events are likely to affect the
> performance of the Collateral Assets (or Reference
> Obligations) serviced or originated by NCFC, which may
> affect the ability of the Issuer to make payments with
> respect to the Rated Notes and the Subordinated Notes.

(Id. ¶ 47.)  Plaintiff argues this disclosure was limited to New

Century's "accounting" problems as opposed to systemic,

quantifiable violations of promises going to the quality of

loans Morgan Stanley was selling to investors through the

Libertas CDO.  (Id. ¶ 49.)

### iv.  Corrected Ratings

Starting in late 2007, disclosures regarding the credit

quality of the assets underlying the rated notes began to

emerge.  (Id. ¶ 67.)  Moody's and S&P downgraded or took

negative action on all of the rated notes.  (Id.)  Many of the

downgraded notes and underlying RMBS dropped from "investment

grade" to "junk" status in a single rating decision.  (Id.)  By

June 2008, the rated notes had been corrected from Triple-A to

very low "junk" ratings.  (Id. ¶ 68.)

In addition to the downgrades, Plaintiff alleges that

recent revelations show Morgan Stanley influenced the ratings

assigned by Moody's and S&P.  (Id. ¶ 70.)  Plaintiff quotes two

portions of a June 11, 2008 statement by then-Chairman of the

United States Securities and Exchange Commission Christopher

Cox, neither of which is specific to the Libertas CDO.  (Id.

¶¶ 71, 73.)  In the first portion, Chairman Cox stated:

> Throughout the subprime crisis, there was a marked
> absence of any clear, prominent explanation of these
> limitations of the ratings on structured products.
> And yet it is now unmistakable that there were
> additional risks associated with credit ratings of
> those products.  Investors weren't told, clearly and
> regularly, what the assumptions were that underpinned
> the ratings.  Nor was it clear how structured finance
> ratings were likely to change based on changes in
> those assumptions.

*     *     *

> As if all of this weren't enough, the limited
> historical data available as a basis for judging the
> credit risk of subprime lending activities
> significantly increased the model risk and the rating
> process.  The historical data on subprime loans were
> based on periods of rising home prices.  As a result,
> the broad market downturn that actually occurred
> wasn't anticipated by the models.

(Id. ¶ 71.)  In the second portion, Chairman Cox stated:

> [We] have learned since then that the ratings of
> structured products in the subprime area made [the]
> conflicts of interest [between the rating agencies and
> issuers] even more acute.  That's because structured
> products were specifically designed for each tranche
> to achieve a particular credit rating — and the
> ratings agencies then made lucrative business of
> consulting with issuers on exactly how to go about
> getting those ratings.  Selling consulting services to
> entities that purchased ratings became a triple-A
> conflict of interest.

(Id. ¶ 73.)

11

In reality, the rated notes were never Triple-A securities,
a fact Morgan Stanley knew, according to Plaintiff.  (Id. ¶ 72.)
Based on Morgan Stanley's collaboration with Moody's and S&P in
creating and marketing the Libertas CDO, Morgan Stanley was
aware the ratings process was corrupted.  (Id.)

### LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure
provides for dismissal of a complaint that fails to state a
claim upon which relief may be granted.  "In ruling on a motion
to dismiss for failure to state a claim upon which relief may be
granted, the court is required to accept the material facts
alleged in the complaint as true . . . ."  Frasier v. Gen. Elec.
Co., 930 F.2d 1004, 1007 (2d Cir. 1991) (citation omitted).  The
Court is also required to read a complaint generously, drawing
all reasonable inferences from its allegations in favor of the
plaintiff.  See Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009)
(explaining that in deciding a motion to dismiss, a court
"consider[s] the legal sufficiency of the complaint, taking its
factual allegations to be true and drawing all reasonable
inferences in the plaintiff's favor") (citation omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to
dismiss does not need detailed factual allegations, a
plaintiff's obligation to provide the grounds of his entitlement
to relief requires more than labels and conclusions, and a

12

formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and internal quotation marks omitted). A plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. __, 129 S. Ct. 1937, 1949 (2009) (citation omitted).

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Although intent may be alleged generally, a plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995) (citations omitted).

To the extent Plaintiff moves to dismiss on the basis of Rule 8(a) of the Federal Rules of Civil Procedure, this Rule provides that a "pleading . . . must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought, which

may include relief in the alternative or different types of relief." FED. R. CIV. P. 8(a)(2), (3).

## DISCUSSION

### I. Common Law Fraud

Plaintiff's first cause of action is for common law fraud under New York law. To state a claim for common law fraud under New York law, a party must allege: "'[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury.'" Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) (citation omitted). Here, Plaintiff fails to adequately allege Morgan Stanley made a materially false misrepresentation or omission of fact.

As an initial matter, it is beyond dispute that Morgan Stanley itself did not issue the Triple-A ratings. (See Compl. ¶ 70 ("recent revelations show, among other things, that Morgan Stanley influenced the ratings assigned by the Rating Agencies") (emphasis added).) Indeed, the Offering Memorandum stated that the rated notes would "be rated 'Aaa' and 'AAA' by Moody's and S&P, respectively."[3] (Rouhandeh Decl. Ex. A at i (emphasis

---

[3] The Court considers the Offering Memorandum even though it was not attached to the Complaint because it was "'incorporated into the complaint by

14

added).)  It also stated that the ratings would be "assigned <u>by</u>
Moody's" and "assigned . . . <u>by</u> S&P."  (<u>Id.</u> at 132–33 (emphasis
added).)

    Unable to argue Morgan Stanley itself issued or assigned
the Triple-A ratings, Plaintiff argues, first, that by
collaborating with the rating agencies, Morgan Stanley designed
the Libertas CDO's weak capitalization structure, and thus
produced—or, in Plaintiff's words, "made"—the false Triple-A
credit ratings.  (Compl. ¶¶ 4, 10, 15, 29, 74.)  Second, after
producing the false Triple-A credit ratings, Plaintiff alleges,
Morgan Stanley promoted the false ratings via the aforementioned
Offering Memorandum and a March 2007 presentation to investors
that was not referenced, in any way, in the Complaint.[4]

    Plaintiff's argument fails on both fronts.  First, in
regard to the allegation "Morgan Stanley collaborated with the
Rating Agencies to produce the false credit ratings[,]" (<u>id.</u>
¶ 10), Plaintiff offers nothing regarding the alleged
collaboration beyond this conclusory allegation.  While the
Complaint makes general statements regarding the relationship
between "issuers and arrangers [such as Morgan Stanley]" and the

---

reference.'"  <u>See</u> <u>In re Citigroup, Inc.</u>, No. 08 Civ. 3095(LTS), 2011 WL
744745, at *5 (S.D.N.Y. Mar. 1, 2011) (citation omitted).

[4] The presentation, which is attached as an exhibit to Plaintiff's opposition,
is a sixty-three page document that appears to be in the form of a slideshow.
(<u>See</u> Davis Decl. Ex. B.)

rating agencies,[5] none pertain, specifically, to the Libertas

CDO.  Absent allegations specific to the Libertas CDO, Plaintiff

fails to plead sufficient factual content from which the Court

can draw any reasonable inference regarding Morgan Stanley's

alleged involvement (with the rating agencies) generating the

Triple-A ratings at issue.  See Iqbal, 129 S. Ct. at 1949; see

also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.

of New York, 375 F.3d 168, 187 (2d Cir. 2004) (explaining that

to plead fraud with particularity, as required by Federal Rule

of Civil Procedure 9(b), the plaintiff must "'detail'" the

conduct "'the plaintiff contends [was] fraudulent'" and "'state

where and when'" the fraudulent conduct took place) (citation

omitted).  Plaintiff's conclusory allegation regarding Morgan

Stanley's alleged collaboration with the rating agencies also

distinguishes this case from those cited by Plaintiff.[6]

---

[5] (See Compl. ¶ 64 ("S&P, for example, has publicly stated" it relies on
"issuers and arrangers [such as Morgan Stanley]" to "perform due diligence"
and "to verify and validate information before they pass it on to others,
including S&P."); id. ¶ 73 (then-Chairman Cox stating, "the ratings of
structured products in the subprime area . . . were specifically designed for
each tranche to achieve a particular credit rating — and the rating agencies
then made a lucrative business of consulting with issuers on exactly how to
go about getting those ratings.  Selling consulting services to entities that
purchased ratings became a triple-A conflict of interest").)

[6] See King Cnty., Washington v. IKB Deutsche Industriebank AG, 751 F. Supp. 2d
652, 656 657 (S.D.N.Y. 2010) (denying motion to dismiss where the plaintiffs
alleged Morgan Stanley "engaged the Rating Agencies . . . and worked directly
with the Rating Agencies . . . to structure the Senior Notes that, plaintiffs
allege, received false and misleading 'Top Ratings'" and where the plaintiffs
alleged Morgan Stanley and "the Rating Agencies . . . 'knowingly designed
models to yield the false and misleading Top Ratings'" using "outdated and
incorrect models based on 'irrelevant historical information preceding 2000'
that produced inflated ratings, a process known as 'grandfathering'")
(citations omitted); see also Pludeman v. N. Leasing Sys., Inc., 890 N.E.2d

16

Second, in regard to the allegation Morgan Stanley promoted the false ratings via the Offering Memorandum and the March 2007 presentation, even assuming the Triple-A ratings were false, this allegation fails, as well. With respect to the Offering Memorandum, it clearly states, on its face, it is not a statement by Morgan Stanley. It states, the "Offering Memorandum . . . has been prepared by the Co-Issuers" (Libertas and Libertas Preferred Funding III, Corp.) and notes that "[t]he Co-Issuers accept responsibility for the information contained in this document." (Rouhandeh Decl. Ex. A at ii.) It goes on to state that "[n]one of the . . . Arrangers" (i.e., Morgan Stanley) "has separately verified the information contained in this Offering Memorandum." (Id. at iii.) It states, lastly, "no representation, warranty, or undertaking, express or implied, is made, and no responsibility or liability is accepted

184, 186–88 (N.Y. 2008) (although noting that New York courts "have never required talismanic, unbending allegations," finding complaint adequately alleged a claim for fraud against corporate officers where, among other things, their "'day-to-day'" management "'of [the] corporate defendant'" "gives rise to the reasonable inference . . . that the officers, as individuals and in the key positions they held, knew of and/or were involved in the [alleged] fraud") (citations omitted); Polonetsky v. Better Homes Depot, Inc., 760 N.E.2d 1274, 1278–79 (N.Y. 2001) (finding the complaint stated a claim for fraud against the defendant, president of the defendant corporation, because it alleged "Fessler 'participate[d] in [Better Homes'] operations on a day-to-day basis and [was] actively involved in its marketing and sales activities'" and because of "the degree of his personal activities"); CPC Int'l Inc. v. McKesson Corp., 514 N.E.2d 116, 124–25 (N.Y. 1987) (finding the plaintiffs stated a claim for aiding and abetting the principal in the commission of a fraud where, among other things, "[t]he complaint includes allegations that the defendants knowingly engaged in a scheme to provide 'substantial assistance' to McKesson in presenting 'an enhanced financial picture' of Mueller in order to 'raise the price that McKesson would ultimately receive for the Mueller stock'").

by . . . the Arrangers . . . or any of their respective affiliates as to the accuracy or completeness of the information contained in this Offering Memorandum." (Id.)

The fact that the Offering Memorandum is not a statement by Morgan Stanley is fatal to this part of Plaintiff's claim. To be liable for fraud under New York law, the defendant must actually make a materially false statement to the plaintiff. See Eurycleia Partners, LP v. Seward & Kissel, LLP, 849 N.Y.S.2d 510, 512 (N.Y. App. Div. 2007) (holding that the plaintiffs failed to state a claim for common law fraud because they did "not allege [the defendants] made any representation, fraudulent or otherwise, to them") (citation omitted); see also Nat'l Westminster Bank USA v. Weksel, 511 N.Y.S.2d 626, 628 (N.Y. App. Div. 1987) (dismissing fraud claim because the plaintiff made "no allegation anywhere in the complaint that the [defendant] made any representation, fraudulent or otherwise, to [the] plaintiff") (citation omitted); Glatzer v. Scappatura, 470 N.Y.S.2d 675, 676 (N.Y. App. Div. 1984) (dismissing fraud claim where the plaintiff "fail[ed] to allege that the moving defendants made any representation, fraudulent or otherwise, to him") (emphasis in original). Because the Offering Memorandum was not a statement by Morgan Stanley, it cannot, as Plaintiff alleges, constitute a materially false statement by Morgan Stanley to Plaintiff. See Williams v. Citibank, N.A., 565 F.

18

Supp. 2d 523, 527 (S.D.N.Y. 2008) (explaining that a "'court need not accept as true an allegation that is contradicted by documents on which the complaint relies'") (citations omitted); see also Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (noting that "[i]f a plaintiff's allegations are contradicted by [a document incorporated into the complaint by reference] those allegations are insufficient to defeat a motion to dismiss") (citation omitted); Rapoport v. Asia Elec. Holding Co., Inc., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If [incorporated] documents contradict the allegations of the . . . complaint, the documents control and this Court need not accept as true the allegations in the . . . complaint.") (citation omitted).

With respect to the March 2007 presentation to investors through which Morgan Stanley allegedly promoted the false Triple-A ratings, as the Court noted above, this document was neither attached nor referenced, in any way, in the Complaint. This fact alone is a sufficient basis for the Court not to consider the presentation and thus defeat this portion of Plaintiff's claim. See, e.g., Locantore v. Hunt, 775 F. Supp. 2d 680, 684 (S.D.N.Y. 2011) (explaining that in adjudicating a motion to dismiss, "'a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the

complaint by reference, and to matters of which judicial notice may be taken'") (citation omitted).   Even were the Court to consider it, however, Plaintiff never alleges it received the presentation from Morgan Stanley.   Thus, like the Offering Memorandum, the March 2007 presentation does not constitute an allegation that Morgan Stanley "made any representation, fraudulent or otherwise, to" Plaintiff.   See Nat'l Westminster Bank USA, 511 N.Y.S.2d at 628 (citation omitted).

For the reasons provided above, Plaintiff fails to plead sufficient facts that allow the Court to draw the reasonable inference that Morgan Stanley made an actionable misrepresentation or material omission to Plaintiff.   See Iqbal, 129 S. Ct. at 1949.   Because a "'misrepresentation or a material omission of fact'" is an essential element for a common law fraud claim under New York law, see Premium Mortg. Corp., 583 F.3d at 108 (citation omitted), Plaintiff fails to state a claim for common law fraud.[7]

## II.   Unjust Enrichment

Plaintiff's second cause of action is for unjust enrichment under New York law.   To state a claim for unjust enrichment under New York law, a plaintiff must adequately allege "'(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'"

---

[7] Because Plaintiff does not adequately allege the first element of common law fraud under New York law, the Court does not reach the other three elements.

Nordwind v. Rowland, 584 F.3d 420, 434 (2d Cir. 2009) (citation omitted).

In Castellano v. Young & Rubicam, Inc., the Second Circuit held that New York's Martin Act, which prohibits fraudulent and deceptive practices in the distribution, exchange, sale, and purchase of securities, N.Y. GEN. BUS. LAW § 352-c, preempts common law claims that do not require proof of scienter.[8]  257 F.3d 171, 190 (2d Cir. 2001).  Because unjust enrichment is a common law claim that does not require proof of scienter, see Nordwind, 584 F.3d at 434, Plaintiff's unjust enrichment claim is preempted by the Martin Act.

**III.  Leave to Amend the Complaint**

In the final paragraph of its opposition to Morgan Stanley's motion to dismiss, Plaintiff argues that if the Court is inclined to grant Morgan Stanley's motion, it should, alternatively, grant Plaintiff leave to amend the Complaint consistent with the Court's rulings.  Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend should be granted "when justice so requires."  FED. R. CIV. P. 15(a)(2).  Here, Plaintiff fails to set forth any reason why it should be allowed to file an amended complaint.  Plaintiff is nonetheless granted leave to file a motion seeking leave to file an amended

---

[8] Enforcement of the Martin Act is limited to the New York Attorney General and local District Attorneys.  Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 354, 369 (S.D.N.Y. 2010) (citation omitted).

complaint.   Plaintiff's motion must be filed within thirty days of this Memorandum and Order and must include, as an attachment, the proposed amended complaint.   If Plaintiff fails to file a motion seeking leave to amend within thirty days, this action shall be dismissed with prejudice.

**CONCLUSION**

For the reasons provided above, Defendants' motion to dismiss the Complaint (Dkt. 11) is GRANTED, with leave for Plaintiff to file a motion seeking leave to file an amended complaint within thirty days of the date of this Memorandum and Order.   The Clerk of the Court is directed to terminate Dkt. 11.

**SO ORDERED:**

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE


Dated:     New York, New York
           September 30, 2011